767 F.Supp. 501 (1991)
In re Proceeding to Compel Adrienne M. LEFKOWITZ, as Preliminary Executrix of the Estate of Nicholas Marsh (a/k/a Nicholas V. Marsh), Deceased,
And/or Arcadia Trading Company, Limited and/or Bay Novelty and Inspection Company, Limited, to turn over the death benefits of certain retirement plans to the Decedent's Surviving Spouse, Irene B. Marsh.
Adrienne M. LEFKOWITZ, Plaintiff,
v.
ARCADIA TRADING COMPANY LIMITED DEFINED BENEFIT PENSION PLAN, Bay Novelty and Inspection Company Limited Defined Benefit Pension Plan, Arcadia Trading Company Limited Pension Trust, Bonus Consultants Limited, the Committee of the Arcadia Trading Company Limited Defined Benefit Pension Plan, the Committee of the Bay Novelty and Inspection Company Limited Defined Benefit Pension Plan, Arcadia Trading Company, Limited, Bay Novelty and Inspection Company, Limited and the Bank of New York, as Preliminary Executor of the Estate of Irene B. Marsh, Defendants.
Nos. 90 Civ. 1716 (KTD), 90 Civ. 2373 (KTD).
United States District Court, S.D. New York.
May 14, 1991.
*502 *503 Rosen, Szegda, Preminger & Bloom, (David S. Preminger, of counsel), New York City, for plaintiff.
McCarthy, Fingar, Donovan, Drazen & Smith (Frank W. Streng, William F. Macreery, of counsel), White Plains, N.Y., for defendant Bank of New York.
Milbank, Tweed, Hadley & McCloy (Lorraine M. Brennan, of counsel), New York City, for all other defendants.

MEMORANDUM & ORDER
KEVIN THOMAS DUFFY, District Judge.
Plaintiff Adrienne M. Lefkowitz originally commenced this action against her mother Irene B. Marsh to recover death benefits from two defined benefit pension plans (collectively "the Plans") adopted by two foreign companies, Arcadia Trading Company Limited ("Arcadia") and Bay Novelty and Inspection Company Limited ("Bay Novelty") in which her father Nicholas V. Marsh was the sole participant, naming Lefkowitz as the sole beneficiary. By Order to Show Cause and petition dated February 23, 1990, Mrs. Marsh commenced a turnover proceeding in Estate of Nicholas V. Marsh, File no. 1980/88, Surrogate's Court, New York County, seeking payment of death benefits on account of her late husband's participation in the two Plans during his life.[1] On March 14, 1990, Lefkowitz removed that proceeding to this court where it was assigned civil docket number 90 Civ. 1716 and Mrs. Marsh promptly moved to remand the action back to the Surrogate's Court. Mrs. Marsh died on May 13, 1990, three days before my decision was rendered retaining jurisdiction and denying her motion to remand. After Mrs. Marsh died, I allowed The Bank of New York to be named as preliminary Executor of the Estate of Irene B. Marsh and it was substituted as the proper party defendant in place of Mrs. Marsh ("Estate of Marsh").
In the interim, on April 6, 1990, Lefkowitz filed the instant complaint with this court, which added certain parties not named and/or properly served in the previous case. I accepted this complaint, 90 Civ. 2373, as related to 90 Civ. 1716, but the cases were never consolidated. In this latest action, Lefkowitz seeks the same benefits as sought by the Estate of Mrs. Marsh. The parties now cross-move pursuant to Fed.R.Civ.P. 56 for summary judgment.[2] Additionally, Lefkowitz seeks a declaratory judgment on the applicability of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 to the two foreign corporate benefits plans at bar.[3]

STATEMENT OF FACTS
Arcadia and Bay Novelty are corporations which were organized and have at all times existed under the laws of Hong *504 Kong. Neither corporation does business in, nor pays taxes to, the United States. Arcadia established the Arcadia Trading Company Ltd. Defined Benefit Pension Plan (the "Arcadia Plan") and Bay Novelty established the Bay Novelty and Inspection Co. Defined Benefit Pension Plan (the "Bay Plan"). Provisions and terms of the Plans are identical. Contemporaneously with the establishment of the Plans, Arcadia and Bay Novelty entered into an agreement creating the Arcadia Trading Company Ltd. Pension Trust (the "Trust"), the purpose of which was, inter alia, to administer the trust fund to which Arcadia and Bay Novelty made the contributions necessary to fund the Plans in accordance with the United States Tax laws.[4] Lefkowitz Motion, Exh. 6. Mr. Marsh, an American citizen and resident, was an employee of both Arcadia and Bay Novelty for the entire time that the Plans were in existence; he was the sole participant in each of the Plans.
The Plans properly filed a Form 5300, an Application for Determination for Defined Benefit Plan, with the United States Internal Revenue Service ("IRS"), seeking determinations that the Plans as drafted met the requirements of the Internal Revenue Code ("IRC"), 26 U.S.C. § 401 entitled Qualified Pension, Profit-Sharing, and Stock Bonus Plans, and § 501 entitled Exception from Tax on Corporations, Certain Trusts, etc. Subsequently, the IRS issued such determination letters for tax qualification to each of the Plans. Lefkowitz Motion, Exh. 3.
On May 26, 1983, Mr. and Mrs. Marsh executed mutual wills. Concurrently, they entered into a separate written agreement ("the Agreement"), pursuant to which neither one would "revoke his or her Will" or "execute a new Will, a Codicil or a trust agreement disposing of his or her property at death...." Lefkowitz Motion, Exh. 14.
Each of the Plans had filed with the IRS a Notice of Intent to Terminate as of December 31, 1984. Lefkowitz Motion, Exh. 9. For tax purposes, "termination" of the Plans was deemed effective by the IRS as of December 31, 1984 and the IRS found no adverse effects from such termination on the Plans qualified tax status. Lefkowitz Motion, Exh. 10.
In May 1986, Mr. Marsh suffered a paralyzing stroke after which Mrs. Marsh sought to and did bar him from their home. Mrs. Marsh then commenced a divorce action in January 1987. Soon after the divorce action was commenced, Mr. Marsh named Lefkowitz as the beneficiary of the death benefits payable under each of the Plans. Lefkowitz Motion, Exh. 11. In August 1987, Mr. Marsh commenced his own divorce action against Mrs. Marsh, claiming abandonment. Lefkowitz Motion, Exh. 27. Mr. Marsh died on March 15, 1988. At the time of his death, neither divorce action had been adjudicated but Mrs. Marsh was still estranged from Mr. Marsh. On May 13, 1990, Mrs. Marsh died. Mr. and Mrs. Marsh had three adult daughters from that marriage, one of whom is Lefkowitz. Mr. Marsh had been estranged from another daughter for ten years prior to his death and from the third daughter from 1983 to 1986.

DISCUSSION
The gravamen of Lefkowitz's complaint is her claimed entitlement to be designated the proper and lawful beneficiary of death benefits accrued by her father from the Arcadia and Bay Novelty Plans, under *505 which he was a sole participant. The Estate of Marsh, however, claims that, "pursuant to the Internal Revenue Code and other federal statutes," Mrs. Marsh was entitled to a certain spousal benefit entitled the qualified pre-retirement survivor annuity ("QPSA")[5] from the two Plans and that Mr. Marsh's purported designation of Lefkowitz, as a new beneficiary, was invalid. As such, the Estate of Marsh seeks to set aside the existing Lefkowitz designation and obtain QPSA benefits based on the application of Title I of ERISA.
After successfully removing this case from the Surrogate's Court, Lefkowitz now avers that the Plans at bar are not under the purview of ERISA for, although having a qualified tax status under the Internal Revenue Code, they are plans in foreign corporations not subject to the Labor sections of ERISA.[6] Lefkowitz acknowledges, however, that these Plans would be subject to regulation under ERISA if they were Plans set up and/or run in the United States pursuant to 29 U.S.C. §§ 1001-1461.[7]
Employee benefit plans are subject to ERISA if they are established or maintained "by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1). Certain plans, however, are exempt from ERISA, under Section 4(b) of Title I, 29 U.S.C. § 1003(b)(4). That section provides a limited exemption for a plan "maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens." There is no dispute that Mr. Marsh was a citizen of the United States, the Plans sought and obtained determinations from the IRS as to their "qualified status," the Plans were amended from time to time to remain qualified under the Tax Code, and Mr. Marsh was the sole participant and trustee of the Plans. Thus, the exemption clearly does not apply in the instant case.
Not only was the sole participant in the Plans a United States citizen, but Mr. Marsh availed himself of all of the concomitant ERISA tax benefits pursuant to Title II of the IRC. Indeed, if the Plans were not qualified plans, contributions to the Plans on behalf of Mr. Marsh would have been included in his gross income for the years in which contributions were made. Arcadia and Bay Novelty along with Marsh availed themselves of all of the privileges under the Internal Revenue Code. To claim, that a pension plan can selectively avail itself of the tax benefits of a qualified pension plan set forth in Title II, and yet not be subject to the rest of ERISA, primarily designed to protect the rights of employees to their benefits, is illogical and not supported by the submissions in this case. Clearly ERISA applies to the Plans at bar and jurisdiction is vested in this court pursuant to 29 U.S.C. § 1132(a)(3).
Considering that the Plans are governed by ERISA, Lefkowitz next claims that she is entitled to the death benefits *506 without having to give up a spousal annuity to Mrs. Marsh's estate, principally because the Plans were never formally amended to adopt the QPSA provisions pursuant to 29 U.S.C. § 1055. This, Lefkowitz maintains, is significant because the Plans were amended periodically to remain tax qualified, yet they were never amended to provide a spousal annuity. The Arcadia and Bay Novelty Plans, however, remained in compliance with the IRC and its separate spousal provisions. Specifically, the Tax Code, in pertinent part states:
In the case of any plan to which this paragraph applies, except as provided in section 417, a trust forming part of such plan shall not constitute a qualified trust under this section unless 
(i) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant is provided in the form of a qualified joint and survivor annuity, ["QJSA"][8] and (ii) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity is provided to the surviving spouse of such participant.
26 U.S.C. § 401(a)(11).
The advent of mandatory spousal annuities or QPSAs derive from and were instituted as part of an overall scheme under the Retirement Equity Act of 1984, ("REA") of 1984, P.L. 98-397 which was signed into law on August 24th of that year. Among other things, it amended various portions of ERISA. In particular, the REA mandated automatic payment of survivor benefits, or a QPSA, to the surviving spouse of a participant vested in a pension plan prior to retirement and/or death. Specifically, ERISA as amended by the REA, provides: "in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant."[9] 29 U.S.C. § 1055(a)(2); 26 U.S.C. §§ 401(a) and 417. According to Lefkowitz, because the REA's effective date succeeded the termination of the Arcadia and Bay Novelty Plans, no QPSA provision can be read into these Plans now.
Lefkowitz further maintains that the Plans, as drafted and as in existence until their respective terminations, always provided: "`Beneficiary' shall mean: (a) the last person ... designated as Beneficiary by the Participant...." Lefkowitz Memo., Exh. 4, Art. I, ¶ 1.6. There is no dispute that Mr. Marsh designated Lefkowitz the last beneficiary within the meaning of the Plans.[10] However, after the REA's effective date, a QPSA was automatically payable on the first day of the subsequent new plan year unless the participant's spouse consented in writing to waive the election to receive such benefits. 26 U.S.C. § 417(a)(2); 29 U.S.C. § 1055(c)(1). The REA was thus effective for plan years beginning after December 31, 1984. The Arcadia and Bay Novelty Plans' "new plan year," subsequent to the enactment of the REA commenced on March 1, 1985.
A transitional rule contained in REA § 303(c)(2) applies where a participant dies after the date of enactment of REA but before the plans have been amended to conform to the REA. Although the statute reads that the rule applies to those participants *507 who die "before the first day of the first plan year to which the amendments made by this Act apply," in most cases a plan would be retroactively amended to the first day of such plan, so that the REA amendments would be taken into account without the need for the transitional rule. In cases such as this one, where the plans were not properly amended to take into account the REA changes, the transitional rule is needed to protect a surviving spouse. The transitional rules provide that if a participant died in the period between the effective date of the amendments and the adoption of the amendments by the plan, the amendments "shall be treated as in effect as of the time of such participant's death." Pub.L. No. 98-397, Title III, Section 303(c); see Lucaskevge v. Mollenberg, 11 E.B.C. 1355, 1989 WL 83197 (W.D.N.Y.1989) ("transitional rules provided that the amendments made by the REA were to take effect immediately (August 23, 1984) even though plans were not required to adopt them until the beginning of plan years commencing after December 31, 1984.") Because the Plans at bar were not effectively terminated on December 31, 1984, I read the QPSA provisions into the Plans via the REA and its transitional rules.[11]
Lefkowitz maintains, however, that she would be divested of a vested interest in the Plans as Mr. Marsh's beneficiary if her designation was considered void by the REA. Moreover, she maintains that the REA has no application to this case because the Plans terminated on December 31, 1984. Thus, Lefkowitz asserts, the transitional rules are of no assistance for they became applicable on the first day of the Plan year after the REA was signed into law, which was not until March 1, 1985, well after the Plans were terminated.
Even if the Plans were not effectively terminated on December 31, 1984, Lefkowitz avers the Plans were never amended to include the QPSA provisions between the passage of the REA and Mr. Marsh's death over four years later. She contends that the corporations' failure to amend their plans was fatal and that retroactively applying the REA at such late a date is fundamentally unfair.
Specifically, Lefkowitz argues that the purpose of the transitional rule was to insure that a very small class of persons, namely the spouses of participants who died before their annuity starting dates and between the passage of the REA and its effective date, were not deprived of QPSA's. She states that Mrs. Marsh does not fall into this protected category. Lefkowitz further claims that the transitional rule is neither a blanket acceleration of the effective date of the REA nor does it provide for coverage of participants who died prior to the time their plans were amended. As such, retroactive application of the REA to mandate Lefkowitz's divestment is not what the statute intended. Indeed, prior to the REA, a beneficiary other than a spouse could be named without having to be divested of a QPSA payment, except if otherwise provided by the Plans. As such, Lefkowitz avers that Mr. Marsh did not die within the window period described in the REA, § 303(c)(2)(C), because the REA never became effective with respect to the plans herein. I disagree.
It is undisputed that the Plans at bar were not amended prior to Mr. Marsh's death, and thus did not reflect the changes made by the REA, and that the decedent died after the effective date of the REA. However, the REA included a transitional rule to provide immediate relief between August 24, 1984, when the statute was enacted, and the time that pension plan is amended in accordance with the REA. Pub.L. No. 98-397, Title III, Section 303(c), 98 Stat. 1452 (1984). Thus, the transitional rule allowing for retroactive application of the REA applies where a participant of a pension benefit plan dies after the effective *508 date of the REA but before the participant's plan was amended. Lucaskevge v. Mollenberg, 11 E.B.C. 1355, 1989 WL 83197 (W.D.N.Y.1989). The Estate of Marsh correctly asserts that even though the Plans at bar were terminated effective December 31, 1984, the Trust continued in existence without Mr. Marsh ever having retired prior to his death. As such, the Trust continued in existence past 1984 and was tax qualified. Because of the self-executing nature of the Code, Mr. Marsh could not designate Lefkowitz as his beneficiary in 1987 without Mrs. Marsh's consent.[12] Since the Arcadia and Bay Novelty Plans were never amended in accordance with the REA and Marsh died after the plans' effective date, the transitional rule should govern the question of the proper beneficiary. As such, under the REA the Estate of Marsh is entitled to QPSAs from the Arcadia and Bay Novelty Plans because Mrs. Marsh never executed a consensual spousal waiver indicating otherwise. See 29 U.S.C. §§ 1055(c)(1) and (c)(2).
Indeed, the spousal consent provision of the REA applies to the Plans even though contributions to the Plans were terminated as of December 31, 1984. On April 11, 1986, the IRS issued a favorable determination letter regarding the contemplated termination of the Arcadia Plan and ruled that the proposed termination would not result in disqualification. However attached to that letter, the IRS set forth numerous caveats, including the IRS's position that "This letter does not apply to any provision" of the REA. See Bramson Affid., Exh. K. Similarly, the Bank of New York acknowledges that on October 8, 1986, the IRS issued a favorable determination letter as to the termination of the Bay Novelty Plan, but an attachment to the letter of the same date sets forth numerous caveats, including the IRS's position that: "This determination does not express an opinion as to whether your plan satisfies the provisions" of the REA. See Bramson Affid., Exh. L.
Nonetheless, Lefkowitz ardently claims that because the IRS was contacted with regard to terminating the Arcadia and Bay Novelty Plans as of December 31, 1984, that the Plans' termination affects the spousal consent rules pursuant to the REA. With regard to whether the two Plans here were terminated for the purpose of determining applicability of the REA, the Treasury Department has provided guidance as to the application of the spousal consent rules under the REA to "terminated" plans. Specifically:
benefits provided under a plan that is subject to the survivor annuity requirements sections of 401(a)(11) and 417 must be provided in accordance with those requirements even if the plan is frozen or terminated. However, any plan that has a termination date prior to September 17, 1985, and that distributed all remaining assets as soon as administratively feasible after that date, is not subject to the survivor annuity requirements.
Treasury Reg. § 1.401(a)-20 (emphasis supplied).
If assets of the plan are not distributed as soon as administratively feasible after a purported date of termination, the plan is not deemed "terminated."
Whether a distribution is made as soon as administratively feasible is to be determined under all the facts and circumstances of the given case but, generally, the distribution which is not completed within one year following the date of plan termination specified by the employer will be presumed not to have been made as soon as administratively feasible.
Rev.Rul. 89-87, 1989  27 I.R.B. 5.[13]
In this case, although the first of the steps toward termination was taken, the *509 second step had not occurred within the suggested one year period. Since the distributions were not completed within one year following the date of termination of the Plans, it is fair to presume that the distributions were not made as soon as administratively feasible. Accordingly, these plans were and are subject to the provisions of ERISA and REA. As such, a QPSA is payable. Without Mrs. Marsh's written consent to waive receipt of the QPSA, Lefkowitz is not entitled to that amount constituting either the QJSA or QPSA.
Under § 401(a)(11)(A) of the IRC, a plan may be qualified if the surviving spouse is entitled to a QPSA, and the employed spouse is a vested participant who dies before the annuity starting date. Mr. Marsh was a vested participant who died while still employed and before receiving any payment.[14] When Mr. Marsh died, he was 83 years old and was still employed by Arcadia and Bay Novelty. Accordingly, he died before the annuity starting date. In these circumstances, the REA mandates payment of Mrs. Marsh's QPSA as the then surviving spouse regardless of who was named a beneficiary, if that beneficiary was not named with the consent of the Plan participant's spouse. See 29 U.S.C. §§ 1055(a)(2), (c)(1)(A)(i), (c)(2)(A). Mrs. Marsh never consented to the Lefkowitz designation before her death, therefore, she and/or the Estate are entitled to that amount constituting the QPSA.[15]
Finally, Lefkowitz argues that Mrs. Marsh was at most entitled to an annuity commencing March 1, 1988 and that to the extent the death benefit exceeds such amount, Lefkowitz as the named beneficiary is entitled to such excess. Apparently, Lefkowitz relies on certain assumptions pursuant to the QJSA rules. When REA was passed, all plans had to provide QJSAs unless the participant's spouse consented to another form of benefit. 29 U.S.C. §§ 1055(a)(1), (c)(1)(A)(i), (c)(2)(A). A QJSA, however, is an annuity in the form of a monthly benefit payable for the life of the retired participant, and upon the participant's death, an annuity of at least 50% and not more than 100% must be paid the participant's surviving spouse. Lefkowitz avers that the QPSA would have to be based on the Plans' QJSA provisions. Thus Mrs. Marsh's estate should be entitled to no more than would have been received in the 26 months from the date of Mr. Marsh's death until Mrs. Marsh's death. Pursuant to QJSA payment provisions, there is a presumption that the participant had retired and commenced receipt of certain monthly benefit payments prior to death and that those payments amounted *510 to no more than 50% of the entire annuity. Such was not the case here, thus, Lefkowitz's position seems untenable.
Moreover, a trust forming part of a plan covered by 26 U.S.C. § 401(a)(11) shall not constitute a qualified trust unless, in the case where the vested participant dies before the annuity starting date and who has a surviving spouse, the surviving spouse is provided with a QPSA. The term QPSA in defined benefits plans,[16] such as the ones at bar, is described in 26 U.S.C. § 417(c)(1) as a survivor annuity for the life of the surviving spouse of the participant if:
(A) the payments to the surviving spouse under such annuity are not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity under the plan (or the actuarial equivalent thereof) if 
(i) in the case of a participant who dies after the date on which the participant attained the earliest retirement age, such participant had retired with an immediate qualified joint and survivor annuity on the day before the participant's date of death.
26 U.S.C. § 417(c)(1)(A)(i).
Lefkowitz maintains, however, that only individual account plans are subject to the proposition that absent spousal consent to the contrary, all of a participant's benefit must be paid to the spouse. By their nature, individual account plans require that the full benefit be paid to the spouse on the participant's death. Under a defined Benefits plan, a QPSA may only pay the survivor 50% of the annuity. Although Lefkowitz's position may have legal basis, and the plans at bar are concededly defined benefits plans, her argument is of no moment. It is set out in the express provisions of the Arcadia and Bay Novelty Plans, namely Article III, that the QJSA is an annuity for the joint lives of the participant and his spouse and unreduced for the life of the survivor of them in an amount equal to the lesser of certain specific amounts. Bramson Affid., Exhs. A and B.
Thus, even if Mr. Marsh had retired the day before his death, Mrs. Marsh would have received a QJSA at 100% unreduced after her husband's death. Accordingly, Mrs. Marsh is entitled to 100% of the actuarial equivalent of the joint and survivor annuity which would have been payable to Mr. Marsh had he retired on the day before his death which would qualify as a QPSA pursuant to 26 U.S.C. § 417(c)(1). Furthermore, § 13.3 of each of the Plans provides that, upon termination, "any funds in excess of the actuarial liabilities of the Employer shall be returned to the Employer." Any funds in excess of the QPSA are apparently payable to the Hong Kong entities of Arcadia and Bay Novelty and the Lefkowitz designation is void under the law and Plans' provisions.
For the foregoing reasons, I declare that ERISA is applicable to the Plans at bar, Lefkowitz's motion for partial summary judgment is denied and the Estate of Marsh's motion for partial summary judgment is granted. An inquest determining the amount of the QPSA is hereby referred to Magistrate Judge Roberts.
SO ORDERED.
NOTES
[1] Mrs. Marsh's petition commencing the turnover proceedings in Surrogate's Court sought to nullify the designation of Lefkowitz as beneficiary of the death benefits under the Plans. She relied on three grounds: (1) that "pursuant to the Internal Revenue Code and other federal statutes," the Plans "must give a qualified pre-retirement survivor annuity to Mrs. Marsh...."; (2) that the designation violates a written agreement between Mr. and Mrs. Marsh; and (3) that Mr. Marsh lacked capacity at the time of the designation of the beneficiary or was subject to undue influence. Petition ¶¶ 12, 17-22.
[2] Counsel for Lefkowitz maintains that because a 3(g) statement, pursuant to the local rules of the Southern and Eastern Districts of New York, did not accompany the Bank of New York's motion for summary judgment that such omission constitutes a fatal deficiency requiring its motion be rejected. While I admonish counsel for the Estate of Marsh to provide such statements in the future, I will accept the Bramson Affidavit as setting forth a concise statement of all of the material facts necessary for the resolution of Bank of New York's motion.
[3] This case is before me because of claims arising under ERISA. I do not intend by this decision to usurp the power of the Surrogate's Court, nor do I intend to act as the Surrogate of the Southern District of New York. What I find so impressive, and indeed troubling however, is the gamesmanship and squabbling that has grown up over nothing more than money in this action. In my mind, nothing is truly gained by either party, and all of this fighting over money is disparaging to a wealthy, essentially broken family where neither party claiming title to the funds manifest entirely pure motives.
[4] If an employer intends to deduct contributions made to a trust that holds the assets of a pension plan, compliance with the tax exemption provisions of the Internal Revenue Code ("IRC"), 26 U.S.C. § 404, is mandatory. In addition, beneficiaries of the trust (those employees who are participants in the plan) will not be taxed on their respective shares of the trust's assets until such time as the beneficiary actually receives a distribution of those assets if the trust is in compliance with the IRC.

The IRC governs the tax status of trusts, but it does not regulate the plan. The failure of a plan to satisfy provisions under the Code renders the trust ineligible for tax qualification. On the other hand ERISA, 29 U.S.C. §§ 1001-1461, regulates trusts and contains extensive fiduciary duty requirements which are absent from the IRC.
[5] "[T]he term `qualified preretirement survivor annuity' means a survivor annuity for the life of the surviving spouse of the participant...." 29 U.S.C. § 1055(e)(1).
[6] ERISA is comprised of several Titles: Title I, the Labor Title, is codified at 29 U.S.C.; Title II, is codified in the Internal Revenue Code or 26 U.S.C. ERISA is now commonly understood to refer to 29 U.S.C. §§ 1001-1461 and not to those provisions of Title II, 26 U.S.C. §§ 401(a) and 501.
[7] Lefkowitz earlier claimed that because the Plans at bar are subject to the provisions of ERISA, this court is vested with proper jurisdiction. It was on that very basis that I retained jurisdiction on May 16, 1990. Since that time, a new Surrogate Eve Preminger was elected, replacing Surrogate Marie Lambert who originally had the Estate of Marsh case. Now Lefkowitz seeks to remand the case back to the state Surrogate's Court, claiming that ERISA is not applicable to the Arcadia and Bay Novelty Plans as they are based in Hong Kong with no apparent ties to the United States except for the fact that Mr. Marsh, a United States citizen, was the sole beneficiary under the Plans. If Lefkowitz's position were to prevail, the logical result would be to place the actions back in the New York State Courts, from which Lefkowitz already sought and obtained removal. This would essentially be inequitable as it appears that Lefkowitz is merely Surrogate shopping by this application.
[8] A QJSA is an annuity in the form of a monthly payment for the life of the participant and, upon the participant's death, an annuity in the same or a lesser amount must be paid the surviving spouse, if any. Payment of a QJSA presumes that the participant began retirement and was paid a certain monthly sum prior to death pursuant to the retirement benefits component of a plan.
[9] Pursuant to REA, the QPSA provisions were not effective until plan years beginning after December 31, 1984. 29 U.S.C. § 1001. The next new plan year for the Arcadia and Bay Novelty Plans commenced March 1, 1985.
[10] Prior to the REA, there was no requirement that a pension plan pay out any sums of money on account of a participant who died before the participant was entitled to commence receiving benefits. The provision of benefits on account of such a participant, i.e., death benefits, was purely voluntary on the part of the plan.
[11] Although it may appear inequitable, in this case, to read in a QPSA to provide for a wife who essentially abandoned her husband, the law and policy require such an outcome not only for this case but also for future cases. Providing for a surviving spouse is of utmost importance and as discussed further infra, Mr. and Mrs. Marsh's marriage remained intact legally until Mr. Marsh's death.
[12] Lefkowitz argues that a QPSA should not be enforceable because Mrs. Marsh was estranged from and abandoned Mr. Marsh after he suffered a stroke, and they both subsequently filed for divorce. For all intents and purposes, the marriage was a nullity and should be deemed dissolved according to Lefkowitz. I disagree. Inequitable as it may seem, the Marsh's were still married under the law because neither divorce was finalized prior to Mr. Marsh's demise.
[13] Counsel for Lefkowitz maintains that Estate of Marsh's reliance on Rev.Rule 89-87 is misplaced, averring that a revenue rule is merely used to advise taxpayers of the IRS's position on a certain subject and is limited to the tax consequences addressed in the revenue rule. Thus, counsel states that Rev.Rule 89-87 merely advises of the IRS's position regarding the tax qualification of trusts in certain circumstances and it may not be read into ERISA. Whether there exists a private right of action pursuant to this revenue rule is of no moment for my reliance in citing this rule is purely constructional, and in aid to interpreting portions of ERISA.
[14] "Annuity starting date" has been defined as "the first day of the first period for which an amount is received as an annuity because of disability or retirement." Pension and Profit Sharing Vol. I ¶ 8072, at 8301 (Prentice Hall).
[15] It is noteworthy that Mr. Marsh, who signed a beneficiary designation form on April 16, 1987 naming Lefkowitz, signed this form almost three years after QPSA requirements were enacted. Moreover, that form was intended for unmarried employees and contained certifications that the participant is "unmarried as of the date hereof." Bramson Affid., Exh.P. Although that provision was crossed out on the form, it further stated the following: "I understand that under current law, if I hereafter marry, my marriage will revoke this designation. I will therefore immediately inform the Plan Administrator of any change in marital status." Mr. Marsh should have been alerted then as to the significance of marital status. That Mrs. Marsh was estranged from Mr. Marsh is of no moment for there was never a decree stating that the couple was divorced prior to Mr. Marsh's death. Under New York law, no judgment, decree, order or other judicial determination regarding separation or abandonment can be rendered or made nunc pro tunc based on Mr. and Mrs. Marsh's matrimonial actions, because both of those actions abated on Mr. Marsh's death. See Davis v. Davis, 75 A.D.2d 861, 427 N.Y.S.2d 891 (2d Dep't 1980), affd., 52 N.Y.2d 850, 437 N.Y. S.2d 77, 418 N.E.2d 670 (1981) (both actions for divorce abated at the death of a spouse). Thus, the integrity of their legal status as a married couple is unquestionable.
[16] A defined benefit plan is simply defined as "a pension plan other than an individual account plan...." 29 U.S.C. § 1002(35). It has no individual accounts, rather, all contributions are made to one fund and a participant's monthly annuity or benefit is based on a formula which accounts for compensation and years of service. Lefkowitz Motion, Exhs. 17 ¶¶ 7 and 8, 18 ¶ 3, and 19 ¶ 2.